FILED

2026 SEP 25 A 11: 44

CLERK OF COURTS
CUYAHOGA COUNTY

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

| | | |
|---|---|---|
| OAK TREE EXECUTIVE CENTER A LLC,<br>411 Boulevard of the Americas, Suite 207<br>Lakewood, New Jersey 08701,<br><br>Plaintiff,<br><br>v.<br><br>T-MOBILE CENTRAL LLC,<br>12920 SE 38th Street,<br>Bellevue, Washington 98006<br><br>Defendant. | ) | CASE NO. CV 26 145312<br><br>JUDGE JOHN P. O'DONNELL<br><br>**REDACTED VERIFIED COMPLAINT**<br><br>**JURY DEMAND ENDORSED HEREON** |

Plaintiff Oak Tree Executive Center A LLC ("***Oak Tree***"), for its Complaint against Defendant T-Mobile Central LLC ("***T-Mobile***"), states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. This action is brought by Oak Tree against T-Mobile for trespass.

2. Oak Tree is a New Jersey limited liability company with its principal place of business at 411 Boulevard of the Americas, Suite 207, Lakewood, New Jersey 08701.

3. T-Mobile is a Delaware limited liability company with its principal place of business at 12920 SE 38th Street, Bellevue, Washington 98006.

4. This Court has personal jurisdiction over T-Mobile, as it conducts business in Ohio, purposefully directs or has directed its actions toward Ohio, and/or has the requisite minimum contacts with Ohio necessary to permit the Court to exercise jurisdiction over it.

5. This Court has subject matter jurisdiction over the common-law claim of trespass against T-Mobile and Plaintiff's request for a declaratory judgment under Ohio law.

6. Venue is proper before this Court pursuant to Civ.R. 3(C)(3) and (5).



CV26145312 221990375

## FACTUAL BACKGROUND

7. Oak Tree is the owner of the property located at 6200 Oak Tree Boulevard, Independence, Ohio 44131, Parcel No. 562-28-019 (the "***Property***"). Oak Tree purchased the Property from its prior owners on or about January 7, 2025.

8. On or about March 12, 2002, VoiceStream Wireless Corporation, T-Mobile's predecessor-in-interest, and 6200 Oak Tree Blvd., LLC, Oak Tree's predecessor-in-interest to the Property, entered into an Office Lease, whereby T-Mobile, as the Tenant, would rent space on the Property. A true and accurate copy of the Office Lease is attached hereto as **Exhibit A**.

9. The Office Lease was amended on December 14, 2011 (the "***First Amendment***"). A true and accurate copy of the First Amendment is attached hereto as **Exhibit B**.

10. The Office Lease was amended again on November 15, 2016 (the "***Second Amendment***"). A true and accurate copy of the Second Amendment is attached hereto as **Exhibit C**.

11. The Office Lease was amended a third time on April 30, 2020 (the "***Third Amendment***"). A true and accurate copy of the Third Amendment is attached hereto as **Exhibit D**.

12. The Office Lease was amended a fourth time on July 17, 2023 (the "***Fourth Amendment***" and ,collectively with the Lease and all other Amendments, the "***Lease***"). A true and accurate copy of the Fourth Amendment is attached hereto as **Exhibit E**.

13. In 2024, Oak Tree's predecessor-in-interest assigned the Lease to 360 S Lake Destiny Drive LLC ("***360 S Lake***"). As a result of the assignment, 360 S Lake became T-Mobile's Landlord for the rented space on the Property. The assignment did not grant 360 S Lake an interest in Oak Tree's property beyond the boundaries of the premises leased to T-Mobile or the ability to

authorize the construction or installation of improvements outside the premises leased to T-Mobile without the prior written consent of the property owner. A true and accurate copy of the lease assignment (the "***Assignment***") is attached hereto as **Exhibit F**.

14. Under the terms of the Third Amendment, T-Mobile was granted use of a specific exterior area on the Property, deemed the "Exterior Generator Field/Heat Rejection Equipment Space," and, with certain other exterior areas, the "Exterior Expansion Space," to install generators and other power equipment (the "***Generator Yard***"). (Ex. D, § 4; Ex. D, Exhibit B-1)

15. Under the terms of the Third Amendment, T-Mobile "agree[d] and acknowledge[d] that the exhibits hereto," including Exhibit B-1, were "intended . . . to depict the location of the applicable areas and the equipment and improvements to be placed therein, [but] shall not in any way limit the provisions of this Third Amendment regarding the Landlord Review[.]" *Id.*

16. The Third Amendment further provided that the Landlord must approve the "plans and specifications" for all construction and installations in or to T-Mobile's Generator Yard before such construction or installation begins:

> Without limiting anything contained in this Third Amendment, and notwithstanding anything contained in this Third Amendment to the contrary, Tenant shall first obtain Landlord's approval of the plans and specifications for all portions of Tenant Expansion Work (including any work, equipment and other improvements proposed to be performed and/or installed by Tenant in the Exterior Expansion Space), and any other work performed by Tenant as may be contemplated hereby, prior to commencement thereof, which approval shall not be unreasonably withheld, conditioned or delayed (the "**Landlord Review**").

(Ex. D, §§ 4, 5) (bolded font in original).

17. The previous Landlord under the Lease (*i.e.*, 360 S Lake's predecessor-in-interest) approved construction/installation plans and specifications for the Generator Yard within certain permitted boundaries, which approval was memorialized in the Fourth Amendment. (Ex. E, § 2

and Ex. A.). The Fourth Amendment specifically provided that "Page 1 of Exhibit A [to the Fourth Amendment] supplements Exhibit B-1 of the Third Amendment." *Id.*

18. In or around June of 2024, T-Mobile began excavation work relating to the construction of the Generator Yard. During that work, T-Mobile failed to employ proper slope stabilization and erosion techniques creating dangerous issues with the hillside abutting the Generator Yard—causing slope instability, erosion, and collapse—and necessitating the completion of slope and soil stabilization, and erosion prevention work, to prevent further collapse.

19. Following that excavation work, T-Mobile began construction work on the Generator Yard. T-Mobile, however, did not construct the Generator Yard within the boundaries permitted by the Lease or in accordance with the terms of the Third and Fourth Amendments.

20. Instead, T-Mobile relocated a portion of the Generator Yard elsewhere on Oak Tree's Property by shifting it approximately thirty (30) to forty (40) feet west of the western boundary permitted under the Lease without authorization.

21. Following Oak Tree's discovery, when it purchased the Property in early 2025, that T-Mobile was relocating the Generator Yard, Oak Tree and T-Mobile traded correspondence and other communications over several months regarding the possibility of reaching an agreement regarding the relocation of the Generator Yard, as T-Mobile did not obtain approval to relocate the Generator Yard before construction of the Generator Yard commenced. These efforts proved futile.

22. At an impasse, Oak Tree's counsel, on July 16, 2026, issued a Cease and Desist Letter (the "***Cease and Desist***") to T-Mobile. The Cease and Desist: (a) informed T-Mobile, again, that it improperly shifted the Generator Yard from the agreed upon location memorialized in the Fourth Amendment and improperly captured part of Oak Tree's Property; (b) demanded that T-

Mobile immediately cease all unauthorized exterior construction work, including work on the Generator Yard; and (c) referenced and attached certain of Oak Tree's previous communications to T-Mobile, detailing T-Mobile's unauthorized exterior construction, including work on the Generator Yard, and insisting that it cease such work. A true and accurate copy of the Cease and Desist is attached hereto as **Exhibit G**.

23. Exhibit A to the Cease and Desist depicts the location of T-Mobile's relocated Generator Yard, which is outside the area authorized by the Third and Fourth Amendments to the Lease and, therefore, trespasses and encroaches on Oak Tree's real property. (Ex. G, Exhibit A)

24. T-Mobile, on July 28, 2026, responded to the Cease and Desist (the "***Response***") s and refused to cease exterior construction. A true and accurate copy of the Response is attached hereto as **Exhibit H**.

25. In its Response, however, T-Mobile did not dispute that the Generator Yard "location was modified" beyond " the originally contemplated footprint." (Ex. H, p. 2)

26. Despite the Cease and Desist and other related communications, and as of the date of filing this Complaint, T-Mobile has continued construction and installation of the Generator Yard on property owned by Oak Tree, and outside the boundaries permitted under the Lease, without authorization, privilege, or permission to do so.

27. The construction has resulted in T-Mobile's clearing, excavation, and grading of Oak Tree's Property, outside the boundaries permitted under the Lease, for the Generator Yard.

28. Upon information and belief, the installation of the generators on the relocated portion of the Generator Yard—by a third-party contractor on behalf of T-Mobile—is imminent as of the date of the filing of this Verified Complaint and will occur on or before September 2nd-3rd of 2026.

29. Additionally, T-Mobile has also intentionally and improperly captured approximately 100 square feet of the fourth floor hallway of the building on the Property, outside the boundaries of the Lease, and has refused to vacate that improperly captured space.

30. Additionally, T-Mobile has intentionally and improperly occupied the entire conduit shaft of the building on the Property, which it has no right to do under the Lease, and has refused to cease its misuse of the building's conduit shaft. T-Mobile's actions have left no space for additional conduits in the building and obstructed access to critical building systems.

31. As a proximate result of T-Mobile's trespass, Oak Tree has incurred, and will continue to incur, damages based on T-Mobile's possession of and permanent alterations to the Property caused by the construction of T-Mobile's impermissibly relocated Generator Yard and T-Mobile's other trespasses and encroachments on spaces outside its permitted boundaries.

32. Oak Tree will suffer irreparable injury in the absence of injunctive relief, for which there is no adequate remedy at law, because, among other things, Oak Tree's real property is being used by T-Mobile without privilege to do so and being permanently altered as a result, including by T-Mobile's construction of the relocated Generator Yard and misuse and unauthorized occupation of portions of the building located on the Property. A preliminary injunction should therefore issue to preserve the *status quo* and to protect Oak Tree's property rights, and a permanent injunction should issue upon the conclusion of this matter.

## COUNT I
## (Trespass)

33. Oak Tree incorporates by reference the allegations contained in paragraphs 1 through 32 hereof as if fully rewritten herein.

34. Oak Tree owns and possesses the real property on which T-Mobile is currently constructing its Generator Yard. The trespassed upon portion of the Property has not been leased

to T-Mobile, or assigned to Landlord, and neither has an interest in that portion of the Property that would allow T-Mobile's unilateral relocation of the Generator Yard to it.

35. Only Oak Tree has the authority to authorize the relocation of the Generator Yard outside its original boundaries agreed upon in the Lease. Nevertheless, T-Mobile did not obtain approval from Oak Tree, or even Landlord, to relocate the construction of the Generator Yard approximately thirty (30) to forty (40) feet further west on the Property than permitted.

36. T-Mobile did not, and does not, have Oak Tree's permission or authorization to enter upon Oak Tree's real property to construct the Generator Yard outside its original area. Yet, T-Mobile has acted intentionally in constructing its relocated Generator Yard without authorization outside the specific exterior area of the Property authorized under the Lease.

37. T-Mobile's relocation of the Generator Yard was not, and is not, approved by Oak Tree constituting an intentional unpermitted entry, intrusion, and trespass on Oak Tree's property.

38. T-Mobile has also intentionally occupied and misused portions of the building on the Property without authorization from Oak Tree and has refused to cease its misuse and improper entry, intrusion onto, and occupation of those portions of the building upon request by Oak Tree.

39. Oak Tree will suffer irreparable injury in the absence of injunctive relief, for which there is no adequate remedy at law, because its real property is being used and permanently altered by T-Mobile, no third parties will be harmed and the public interest will be served by the issuance of an injunction, and Oak Tree has a substantial likelihood of success on the merits.

40. As a direct and proximate result of T-Mobile constructing its Generator Yard on Oak Tree's property, Oak Tree has suffered damages to its property in excess of $25,000.

**COUNT II**
**(Declaratory Judgment)**

41. Oak Tree incorporates by reference the allegations contained in paragraphs 1 through 32 as if fully rewritten herein.

42. The Ohio Declaratory Judgment Act, Ohio Rev. Code § 2721.01 *et seq.*, empowers courts of record to declare rights, status, and other legal relations whether or not further relief is or could be claimed.

43. Oak Tree owns and possesses the real property on which T-Mobile is currently constructing its Generator Yard.

44. Oak Tree has notified T-Mobile that it is constructing and installing the relocated Generator Yard outside the area authorized by the Third and Fourth Amendments to the Lease and, therefore, trespassing and encroaching on Oak Tree's real property. T-Mobile disputes that the relocated Generator Yard is outside the area authorized by the Lease.

45. An actual controversy exists between Oak Tree and T-Mobile concerning whether the portion of real property on which T-Mobile is constructing the relocated Generator Yard falls within the premises leased to T-Mobile under the terms of the Lease and speedy relief is necessary to protect Oak Tree's rights.

46. Oak Tree is entitled to a determination of T-Mobile's rights under the Lease, including a declaration that the area of the relocated Generator Yard is outside the boundaries of the premises leased to T-Mobile under the Lease, that the Lease does not grant T-Mobile any right to possess, enter upon, use, occupy, or construct on the area of the relocated Generator Yard, and that T-Mobile's claimed rights do not extend to the area of the relocated Generator Yard.

**WHEREFORE**, Plaintiff Oak Tree Executive Center A LLC prays for judgment in its favor and against Defendant T-Mobile Central LLC as follows:

A. Injunctive relief ordering T-Mobile to: (a) permanently discontinue construction and installation of the Generator Yard outside the specific exterior area leased to it for those purposes under the terms of the Lease, (b) permanently cease its misuse of, and vacate, the other improperly occupied portions of the building on the Property, and (c) halt all construction and installation of the Generator Yard to preserve the *status quo* during the pendency of this matter;

B. A declaration that the area of the relocated Generator Yard is outside the boundaries of the premises leased to T-Mobile under the Lease, that the Lease does not grant T-Mobile any right to possess, enter upon, use, occupy, or construct on the area of the relocated Generator Yard, and that T-Mobile's claimed rights do not extend to the area of the relocated Generator Yard.

C. Compensatory damages in an amount to be proven at trial, but reasonably believed to exceed $25,000.00;

D. Pre-judgment and post-judgment interest; and

E. Such other relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Colleen M. O'Neil*
Colleen M. O'Neil (0066576)
Nicholas A. Bonaminio (0097149)
Kelsey L. Baughman (0101429)
Kimberly G. Sweeney (0106229)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114
Tel: (216) 622-8200
Fax: (216) 241-0816
kbaughman@calfee.com

*Attorneys for Plaintiff Oak Tree Executive Center A LLC*

**JURY DEMAND**

Plaintiff Oak Tree Executive Center A LLC hereby demands a trial by jury on all issues so triable.

*/s/ Colleen M. O'Neil*
Colleen M. O'Neil (0066576)

*One of the Attorneys for Plaintiff Oak Tree Executive Center A LLC*

**VERIFICATION**

STATE OF NEW JERSEY )
)
OCEAN COUNTY )

**I, Norman Eisen,** being over the age of majority and sworn according to law, say and depose as follows:

1. I am the Authorized Signatory for Oak Tree Executive Center A LLC ("Oak Tree");

2. In my capacity as the Authorized Signatory for Oak Tree, I have read the foregoing complaint and the factual allegations contained therein are true and accurate to the best of my personal knowledge, information, and belief.

Norman Eisen
Authorized Signatory
Oak Tree Executive Center A LLC

Sworn to before me and subscribed in my presence by Norman Eisen this 25 day of August, 2026.

MINDEL LOPIAN
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES 04/29/31
COMMISSSION # 50158941

Notary Public

# EXHIBIT A

[TO BE FILED UNDER SEAL]

# EXHIBIT B

[TO BE FILED UNDER SEAL]

# EXHIBIT C

[TO BE FILED UNDER SEAL]

# EXHIBIT D

[TO BE FILED UNDER SEAL]

# EXHIBIT E

[TO BE FILED UNDER SEAL]

# EXHIBIT F

# EASEMENT AND ASSIGNMENT OF LEASE AGREEMENT

PIN: 562-28-015

STATE OF: OHIO
COUNTY OF: CUYAHOGA

Document Date: ________________

| | |
|---|---|
| **GRANTOR:** | OAK TREE EXECUTIVE CENTER LLC, a New Jersey limited liabilty company |
| Address: | 411 Boulevard of Americas, Suite 207,<br>Lakewood, NJ 08701 |
| **GRANTEE:** | 360 S LAKE DESTINY DRIVE, a Delaware limited liability company |
| Address: | P.O. Box 3429<br>400 Continental Blvd., Ste. 500<br>El Segundo, CA 90245 |

Legal Description: Attached as Exhibit A.

**Prepared by:**
Landmark Dividend LLC
P.O. Box 3429
400 Continental Blvd., Suite 500
El Segundo, CA 90245
SC240007

**Return after recording to:**
Madison Title Agency
1125 Ocean Avenue
Lakewood, NJ 08701
File No: MTAOH-193565-Easement

# EASEMENT AND ASSIGNMENT AGREEMENT

This EASEMENT and Assignment Agreement (the "**Agreement**") is entered into this _____ day of ___________ 2024 (the "**Effective Date**") by and between **OAK TREE EXECUTIVE CENTER LLC**, a New Jersey limited liability company with offices located at 411 Boulevard of Americas, Suite 207, Lakewood, NJ 08701 ("**Grantor**") and **360 S LAKE DESTINY DRIVE LLC**, a Delaware limited liability company with offices located at 400 Continental Blvd, Suite 500, El Segundo, California ("**Grantee**"). All references hereinafter to "Grantor" shall include its successors and assigns as owner(s) of the Property (as defined below). All references hereinafter to "Grantee" shall include its successors and permitted assigns. Grantor and Grantee shall be referred to individually each as a "**Party**" or collectively as the "**Parties**".

## RECITALS

**WHEREAS**, Grantor owns (or will own contemporaneously with the closing hereunder) that certain building consisting of approximately 228,974 square feet ("**Building** ") commonly known as and located at 6200 Oak Tree Blvd. , in the City of Independence, County of Cuyahoga, State of Ohio and the real property upon which the Building is located (the "**Land**") (Buildings and Land may hereinafter be referred to collectively as the "**Property**"), all as more particularly described on Exhibit A attached hereto; and

**WHEREAS**, Grantor currently leases (or will lease contemporaneously with the closing hereunder) 44,477 net rentable square feet of space in the Building to T-Mobile Central LLC (the "**Tenant**") for office, data center and/or telecommunications purposes as set forth therein which portions are more particularly described on Exhibit B attached hereto and incorporated herein (the "**Leased Premises**"), pursuant to that certain Office Lease dated March 12, 2002, as amended, by that certain First Amendment to Office Lease dated December 14, 2011, as further amended by that certain Second Amendment to Office Lease dated November 15, 2016, as further amended by that certain Third Amendment to Office Lease dated April 30, 2020, as further amended by that certain Fourth Amendment to Office Lease dated July 17, 2023, all of which are more particularly described on, and for which a copy is attached hereto and incorporated herein as Exhibit C ( the "**Existing Agreement**");

**WHEREAS,** Grantor and Grantee are entering into this Agreement pursuant to a Purchase and Sale of Easement and Assignment of Lease Agreement between them of even date herewith ("**Purchase and Sale Agreement**");

**NOW, THEREFORE,** in consideration for the payment agreed in the Purchase and Sale Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and Lessee do hereby agree as follows:

1. **GRANT OF EASEMENT.** Grantor hereby grants to Grantee and Grantee assumes from Grantor an exclusive easement in, to, over, under, across and through the Leased Premises for the following purposes, with this Agreement and the Existing Agreement effected hereby to be subject to the rights of Tenant under the Existing Agreement:

For the purpose of leasing space in the Easement Area to the Tenant for and telecommunications infrastructure to include without limitation cellular switches, fiber optic networks, and networked computer servers for the remote storage, processing and/or distribution of large amounts of electronic data and utilities (collectively, the "**Facilities**") and any ancillary activities and uses specifically related thereto (collectively, the "**Permitted Use**") and uses associated with the exercise of rights of such tenants under such leases with respect to the Easement Area, including without limitation the Existing Agreement; provided, however, that the installation of any improvements of Facilities outside of the Easement Area shall require the prior written consent of Grantor, which consent shall not be unreasonably withheld, delayed or conditioned provided said improvements outside of the Easement Area are *de minimis* or such installation is required pursuant to the Existing Agreement; and

To install and maintain such Facilities from the nearest public right-of-way (on a non-exclusive basis) to, in, on, over and under the Easement Area to include risers, conduits, shafts, raceways, pathways, mechanical rooms, electrical closets or other space as applicable and hereinafter reasonably designated by Grantor to connect the data center and/or telecommunications equipment to other locations in the Building as necessary to install wiring, electrical equipment and other personal property to support and maintain the Facilities, provided, however, that (i) subject to the terms of the Existing Agreement, in no event shall any such rights materially interfere with the use and enjoyment of the Building by Grantor, its tenants, licensees or invitees, and (ii) subject to the terms of the Existing Agreement, any installation shall be subject to Grantor's prior written approval as to only the location of any Facilities, which approval shall not be unreasonably withheld, delayed or conditioned.

All such installation and maintenance shall be at Tenant's sole cost, expense and risk and at no cost, expense, obligation or liability to Grantor.

2. **ASSIGNMENT**. Grantor hereby transfers and assigns to Grantee, as of the Effective Date, all of Grantor's right, title and interest in, to and under the Existing Agreement, including without limitation, all rents, including, without limitation rent due for any holdover period, and any other monies due Grantor specified therein; provided however, Grantor shall retain and continue to faithfully perform and discharge those obligations under the Existing Agreement that are incidental to fee ownership of the Property and cannot be performed by Grantee, including, without limitation, but only to the extent applicable or required by that certain Office Lease dated March 12, 2002 (the "**Office Lease**"), the obligations pursuant to Sections 11, 16, 20, 22, 25 and 60 with respect to maintenance and repair, utilities, insurance and indemnification, compliance, access, cooperation, quiet enjoyment and payment of any real property tax that is not the responsibility of the Tenant or Grantee as described herein. Notwithstanding anything herein to the contrary, Grantor shall be responsible for the completion of all recommendations made pursuant to that certain Property Condition Assessment, dated January 26, 2024, by GRS Group, related to the structural integrity and operational capability of the Property that are not the responsibility of the Tenant. Further, Grantor shall retain the obligation to maintain the Property and all improvements thereon to the extent required under the Existing Agreement. Grantor hereby expressly retains all rights and remedies that it may have against Tenant with respect to the payment of any additional fees for the payment of taxes, Tenant's proportionate share and/or Common Area Expense (as described in Sections 6, 7,8 and 9 of the Office Lease ) (hereinafter collectively as "**CAM**"), insurance, and utilities ("**Additional Fees**"), subject to the terms and conditions of Section 14(c) hereof. Grantee shall use commercially reasonable efforts to enforce the terms of the Existing Agreement against Tenant and in favor of Grantor. Notwithstanding anything to the contrary as set forth herein, Grantor agrees and acknowledges that Grantor and/or Tenant own and/or controls all above-ground storage tanks ("**AST**") and/or underground storage tanks ("**UST**") located on the Property; and that throughout the Term, Grantor and/or Tenant shall own, register, maintain and repair any and all ASTs or USTs located on or under the Property or cause the Tenant or any Replacement Tenant (as hereinafter defined) to own, register, maintain and/or repair all ASTs and USTs located on or under the Property. For avoidance of doubt, Grantee shall have no interest, liability or obligation with respect to any AST or UST located on or under the Property.

3. **REPLACEMENT LEASE**. Commencing upon the expiration or termination of the Existing Agreement (including without limitation, a termination resulting from a default or breach by Tenant or rejection of the Existing Agreement in bankruptcy), Grantee shall be permitted to (i) amend the Existing Agreement to extend the term therein, in lieu of expiration, but in no event beyond the expiration of the Term hereof, or (ii) if the Existing Agreement is not renewed or extended, lease space within the Easement Area (a "**Replacement Lease**") to another tenant (each, a "**Replacement Tenant**", which Replacement Tenant shall be deemed a Tenant as such term is defined herein). Any Replacement Leases may convert the Easement Area to any legally permitted use, other than the growth, sale or distribution of cannabis, including, without limitation, office and/or warehouse, to the extent permitted by applicable zoning and land use laws. Grantee agrees that any and all Replacement Lease(s) shall require the Replacement Tenant(s) to indemnify, defend and hold Grantor harmless from and against any and all claims arising out of such Replacement Tenant's use of the Easement Area and shall further require all Replacement Tenants to name Grantor, and other parties reasonably requested by Grantor, as additional insureds on the Replacement Tenant's commercial general liability and automobile policies. Notwithstanding anything herein to the contrary, Grantee shall be free to negotiate rental amounts for any and all Replacement Leases in its sole discretion. Except for the Additional Fees, Grantor shall not be entitled to receive rent or any other additional consideration for the Replacement Lease(s), it being agreed that the Purchase Price (as such term is defined in the Purchase and Sale Agreement) constitutes good, valuable and sufficient consideration for the Replacement Lease(s). Grantee shall provide Lessor written notice and copies of the Replacement Lease(s), as well as contact information for the Replacement Tenant(s), no later than fifteen (15) business days after the full execution of same. All such Replacement Leases shall contain removal and restoration terms materially similar to those contained in the Existing Agreement. Grantee shall require that the Replacement Tenant(s) be required to perform all work done on the Property in compliance with all applicable laws, regulations, conditions of approval, codes and ordinances. Grantee shall require that any Replacement Tenant be responsible for all increases in real and personal property taxes, and similar governmental impositions that are directly attributable to any alterations and shall indemnify and hold Grantor harmless with respect thereto. Grantee shall require that the Replacement Tenant(s), if any, be fully liable for all work done in conjunction with the alterations and utility installations and fully indemnify, defend, and hold Grantor harmless from and against any and all claims, liabilities, costs, expenses or damages arising out of the alterations, utility work or other actions taken by one or more Replacement Tenant(s). Grantee shall ensure that all Replacement Leases are true triple net leases. Notwithstanding anything to the contrary herein, in no event shall Grantee be permitted to enter into a lease, license or similar type of agreement for the use of any portion of the Easement Area with a term that extends beyond the Term without Grantor's prior written consent, which may be withheld in Grantor's sole and absolute discretion.

4. **TERM.** Commencing on ________________, 2024 (the "**Commencement Date**"), the "**Term**" of this Agreement shall be ninety-nine (99) years.

5. **TERMINATION.** Grantor may not terminate this Agreement. Notwithstanding anything to the contrary herein, upon the expiration or earlier termination of the Existing Agreement, Grantee may, at its sole discretion, terminate this Agreement with thirty (30) days' prior notice.

6. **INDEMNIFICATION**. Notwithstanding anything to the contrary as set forth herein, Grantor agrees to indemnify, defend and hold harmless Grantee, its affiliates, successors and assigns (collectively the "**Grantee Indemnities**") from and against any and all losses, claims or causes of action (regardless of whether any such Grantee Indemnitee is a party to the action for which the indemnification hereunder is sought) incurred by any Grantee Indemnitee in connection with, as a result of, or rising out of, or relating to or incident to (i) the 4,000-gallon diesel fuel UST installed and located at the Property as further described in that certain Peer Review by AEI dated February 12, 2024; (ii) roof leakage into the Tenant's unit utility room as further described in that certain Property Condition Assessment by GRS Group dated January 26, 2024 and (iii) the five (5) elevators installed and located at the Property as further described in that certain Property Condition Assessment by GRS Group dated January 26, 2024. Upon the completion of the aforementioned repairs, the maintenance and repair obligations related to the foregoing will be governed by the Existing Agreement.

7. **IMPROVEMENT; UTILITIES; TENANT'S PERCENTAGE**.

a. Except as otherwise provided in the Existing Agreement for so long as it is in effect (including any renewal or option terms set forth therein as of the Effective Date, if exercised), Grantee and its Tenant may at its sole cost and expense, construct (or replace) improvements in the Easement Area, all of which shall be deemed part of the Facilities. The Facilities shall remain the personal property of Grantee and/or its Tenant, as applicable, and shall be removable at any time at the discretion of Grantee and its Tenant and Grantor shall possess no right, title or interest therein. Subject to the terms of the Existing Agreement, at the expiration or earlier termination of this Agreement, Grantee shall cause to be removed all Facilities installed by it or its Tenant after the date hereof and Grantee shall cause to be repaired any damage to the Building (including to the Easement Area) resulting from any such removal and restore any affected areas thereof. Grantor shall, at no cost to Grantor grant to Grantee the right to locate utilities on the Property to serve the Easement Area at locations reasonably acceptable to Grantor, Grantee and Tenant. Grantor shall, upon Grantee's request, execute and record a separate easement agreement with Tenant or the utility service provider, as the case may be, in a form and substance reasonably satisfactory to Grantor, Grantee and Tenant. Grantor shall not materially or unreasonably prevent access to, and use of, any right of ingress or egress as set forth herein by Grantee or Grantee's Tenant; and Grantor shall not utilize any right of ingress or egress in any manner that unreasonably interferes with Grantee's or its Tenant's use of such area. Grantee shall not materially or unreasonably prevent access to, and use of, any right of ingress or egress as set forth herein by Grantor or its Tenant. Grantor will cooperate with Grantee, at no cost or expense to Grantor, to apply for and obtain any and all licenses, permits, consents or approvals which may be required in connection with the use of the Easement Area by Grantee or its Tenant.

b. Except as otherwise provided in the Existing Agreement for so long as they are in effect and in accordance with their terms, Grantee shall use commercially reasonable efforts to ensure that Tenant shall repair any damage caused by the installation, construction, repair or removal of the Facilities. Grantee shall and shall cause its Tenant to indemnify Grantor with respect to any damage or loss to property or personal injury resulting from the installation, construction, repair or removal of the Facilities.

c. Except as otherwise provided in the Existing Agreement for so long as they are in effect, Tenant shall continue to obtain electric service directly from the area electric utility, which shall be paid for by Tenant in the manner described in the Existing Agreement.

d. Upon the expiration or earlier termination of the Existing Agreement, Grantee shall be responsible, either individually or jointly and severally with a Replacement Tenant, as the case may be, for all Additional Fees, provided Grantee may have the property taxes reassessed to account for Grantee's change in use of the Leased Premises.

e. Anything to the contrary notwithstanding, Grantor shall have no obligation to pay for any utilities used by or for Grantee, Tenant, Replacement Tenant or any other party acting by or through Grantee.

f. Upon the expiration or earlier termination of the Existing Agreement, Grantee shall be responsible for the payment of the Additional Fees which shall be based on the Tenant's Additional Fees pursuant to the Existing Agreement. Any Replacement Tenant shall be jointly and severally liable with Grantee for payment of the Additional Fees with respect

to those portions of the Easement Area demised by the Replacement Lease. In the event Grantee surrenders any portion of the Leased Premises, the Tenant's share shall be adjusted accordingly, and the Parties shall execute such documentation to reflect same.

**8. <u>COVENANTS AND AGREEMENTS OF GRANTOR.</u>**

a. Grantor represents and warrants that as of the Closing, it is the owner of one-hundred percent (100%) of the fee simple interest of the Property, free and clear of all liens and encumbrances other than the Existing Agreement (except for matters that have been approved or deemed approved by Grantee and except for liens and encumbrances that do not affect the Easement Area), and that it has the right to lease the Leased Premises and assign the Existing Agreement. Grantor further represents and warrants that Grantee shall peaceably and quietly hold and enjoy the Easement Area during the Term without any hindrance, molestation or ejection by any party claiming through Grantor, subject to the terms of this Agreement and the Existing Agreement.

b. During the Term, Grantor shall pay when due all real property taxes and all other taxes, fees and assessments attributable to the Property (collectively, "**<u>Real Property Taxes</u>**"). If Grantor fails to pay before delinquency the Real Property Taxes, and is not contesting them, in good faith, Grantee shall have the right but not the obligation to pay such taxes after first having given Grantor no less than ten (10) business days' notice before any such payment by Grantee, and thereafter demand payment from Grantor, which payment Grantor shall make within ten (10) business days of such demand by Grantee, with interest at three percent (3%) per annum from the date of Grantee's notice until fully paid.

c. Grantor shall use commercially reasonable efforts to ensure that utilities are available to the Building (subject to interruptions outside Lessor's control and Force Majeure (as defined below)) and pay any costs associated with common area utilities. The foregoing notwithstanding, Grantor shall not be responsible for the failure or lack of availability of any utility unless same was caused by the negligence of Grantor.

d. Subject to the terms and requirements of the Existing Agreement, Grantor shall use commercially reasonable efforts to maintain the Building and the Property at all times in good condition (subject to casualty damage and matters outside Grantor's control and Force Majeure) and (subject to Section 9(c) below) in material compliance with all applicable laws, statutes and regulations required for Grantee and its then-existing Tenant's use of the Leased Premises.

e. Grantor shall not grant, create, or suffer any claim, lien, encumbrance, easement, restriction or other charge or exception to title to the Property that would materially adversely affect Grantee's use of the Leased Premises.

**9. <u>COVENANTS AND AGREEMENTS OF GRANTEE.</u>** Grantee acknowledges that it and its Tenant shall use the Leased Premises only for the Permitted Use. In connection with its use pursuant to this Agreement, Grantee agrees that it will:

a. following expiration or termination of the Existing Agreement, subject to Grantor's obligation to maintain the Property, maintain, or cause Tenant to maintain, the Easement Area and the Facilities at all times in good condition (subject to casualty damage, matters outside Grantee's control and Force Majeure) and in material compliance with all applicable laws, statutes and regulations.

b. make commercially reasonable efforts to ensure that use of the Easement Area complies with all applicable laws and regulations, including real estate laws and regulations, and shall indemnify Grantor for any non-compliance with such laws and regulations.

c. obtain and maintain, or cause Tenant to obtain and maintain, throughout the term of this Agreement a customary policy of commercial general liability insurance naming Grantor as an additional insured, with liability limits, of not less than One Million Dollars ($1,000,000.00) per occurrence and Three Million Dollars ($3,000,000) aggregate (or such higher amounts as may be reasonably required in similar circumstances by banks or institutional real estate lenders or institutional real estate owners or operators and provided such higher amounts are consistent with current market conditions at the times such higher amounts are so required), with a deductible not to exceed Ten Thousand Dollars ($10,000). Grantee agrees to provide satisfactory evidence of such insurance coverage upon request upon the issuance and renewal of such policy. Such evidence or certificate of insurance shall provide for thirty (30) days' advance notice, if practicable, to such insured parties in the event of cancellation of the insurance.

d. any increase in Real Property Taxes against the Property from and after the Effective Date, which are directly attributable to the Grantee's use of the Easement Area or the Property, shall be paid by Grantee or the person responsible for such obligation under the Existing Agreement or any applicable relevant Replacement Agreement. If Grantee or a Tenant is obligated to pay any Real Property Taxes, but fails to pay such taxes (or reimburse Lessor) within forty-five (45) days of Grantor's notice of such obligation, Grantor may enforce its rights and remedies pursuant to this Agreement including, if applicable, against Tenant or Grantee as the case may be but in no event shall Grantor have the right to terminate this Agreement or evict or dispossess Lessee or Tenant from the Easement Area.

e. in addition, and not in limitation of subsections (a) and (c) above, in the event of the expiration or termination of the Existing Agreement operate and maintain the Facilities or cause Tenant to remove the Facilities, and at all times cause its Tenant to operate and maintain the Facilities, in compliance with all applicable laws, ordinances, rules, regulations and other requirements relating to data center and/or telecommunication facilities, including those laws, ordinances, rules, regulations and other requirements relating to radio frequency emissions by such facilities.

f. accept the Easement Area and the Property in their "As-Is, Where-Is" condition.

g. Grantee, throughout the Term, shall, at no expense to Grantor, use commercially reasonable efforts to cause the Easement Area to be kept and maintained, and taken good care of, and all needed interior and non-structural repairs and replacements (provided they are necessitated by and necessary for Tenant's use of the Leased Premises) in and to, the Easement Area to be made in accordance with the terms of the Existing Agreement.

h. Commencing on the date herein and for no less than forty-eight (48) months thereafter, Grantee shall use Grantor's affiliate as property manager to manage the Premises. Grantor and Grantee shall enter into a separate property management agreement for the management of the Leased Premises.

10. **NON-DISTURBANCE**. During the Term, Grantor shall not block Grantee's or its Tenant's access to the Easement Area, inhibit access or utilities to or from the Easement Area, prevent or otherwise materially interfere with landline communications to and from the Easement Area. In the event any of the foregoing has occurred, Grantee shall promptly notify Grantor in writing, and provide reasonable detail of any alleged disturbance, as well as any requested action. Grantor, for itself, its successors and assigns, hereby agrees to prevent the occurrence of any of the foregoing and shall promptly undertake any remedial action reasonably necessary to do so. Notwithstanding the foregoing, Grantee acknowledges that, from to time, in connection with any repairs, maintenance or replacement of the roof or other portions of the Building to be undertaken by Grantor, Grantee's access to the Easement Area may be reasonably limited, and the transmission of digital information and/or telecommunications signals to and/or from the Easement Area may be reasonably impaired. Grantor shall provide prior reasonable notice to Grantee (except in the event of emergency) and shall take all such necessary actions to minimize any such disruption to Grantee's or its Tenant's access to the Easement Area or any impairment of the transmission of digital information and/or telecommunications signals. Nothing herein contained shall limit Grantor's right to place any mortgages on the right, title and interest of Grantor under this Agreement and in the Easement Area and/or the Property, including the fee simple and reversionary estates of Grantor therein.

11. **GRANTEE COVENANTS WITH RESPECT TO EXISTING AGREEMENT**. From and after the Effective Date, Grantee shall not, without the prior written consent of Grantor (which shall not be unreasonably withheld or conditioned), amend or modify the Existing Agreement in any manner which would have the effect of increasing the obligations of Grantor or successor owner(s) of the Property or to extend the term beyond the expiration of this Agreement. Within thirty (30) days of entering into any amendment or modification of the Existing Agreement, whether or not Grantor's consent is required, Grantee shall use reasonable efforts to provide to Grantor true, correct and complete copies thereof, but Grantor acknowledges that the failure of Grantee to provide such copies will not constitute a default under this Agreement. Grantee acknowledges that any and all amendments or modifications to the Existing Agreement shall require compliance with this Agreement to the extent applicable (for example, any construction or replacement of Facilities shall comply with the requirements of Section 6 above).

12. **GRANTEE COVENANTS WITH RESPECT TO REPLACEMENT AGREEMENTS**. From and after the Effective Date, Grantee may enter into Replacement Agreements with Tenant as set forth in Section 3 above. Grantee agrees that such agreements shall not, without the prior written consent of Grantor (which shall not be unreasonably withheld or conditioned), increase the obligations of Grantor (or successor owner(s) of the Property) or have a term or duration extending beyond the expiration of this Agreement. All Replacement Agreements shall require Tenant thereunder to defend, indemnify and hold harmless Grantor for losses, costs and damages arising from or relating to the tenant's use or occupancy of the Easement

Area to the same extent as tenant is required to do so for Grantee. Within thirty (30) days of entering into any Replacement Agreement with a tenant (or an amendment thereto), whether or not Grantor's consent is required, Grantee shall use reasonable efforts to provide to Grantor a true, correct and complete copy thereof, but Grantor acknowledges that the failure of Grantee to provide such copies will not constitute a default under this Agreement. All Tenants shall acknowledge they are bound by the terms and conditions of this Agreement to the extent applicable (for example, Grantor may enforce any of its rights or remedies under the Replacement Agreement as provided in Section 3 above).

**13. <u>ENVIRONMENTAL REPRESENTATIONS.</u>**

a. **Grantor Environmental Representation.** Except as previously disclosed to Grantee, Grantor represents that it has no knowledge of any substance, chemical or waste (collectively "**<u>Hazardous Substance</u>**") on the Property that is identified as hazardous, toxic or dangerous in any applicable federal, state or local law or regulation. Grantor shall not introduce or use (or permit the use of) any Hazardous Substance on the Property in violation of any applicable federal, state or local environmental laws. Grantor shall be responsible for (and shall promptly conduct any investigation and remediation as required by any applicable environmental laws) all spills or other releases of any Hazardous Substance not caused solely by Grantee, that have occurred, or which may occur on the Property.

b. **Grantee Environmental Representations.** Grantee shall not introduce or use any Hazardous Substance on the Property or the Easement Area in violation of any applicable federal, state or local environmental laws. Notwithstanding the foregoing, Grantee shall not be responsible for any Hazardous Substances arising or present on or before the Effective Date. Liability of Grantee for any claims with respect to any Hazardous Substances at the Property or the Leased Premises shall be limited to contamination which is shown by clear evidence to have been solely caused by a release of a Hazardous Substance by Grantee after the Effective Date, and in violation of any applicable federal, state or local environmental laws.

c. **Mutual Indemnification.** Each party agrees to defend, indemnify, and hold harmless the other from and against any and all administrative and judicial actions and rulings, claims, causes of action, demands and liability including, but not limited to damages, costs, expenses, assessments, penalties, fines, cleanup, remedial, removal or restoration work required by any governmental authority, losses, judgments and reasonable attorneys' fees that the indemnified party may suffer or incur due to the existence or discovery of any Hazardous Substance on the Property caused by the other party. This indemnification shall also apply to the migration of any Hazardous Substance to other properties, and the release of any Hazardous Substance into the environment that relate to or arise from the indemnitor's activities on the Property. Grantor agrees to defend, indemnify, protect and hold Grantee harmless from claims resulting from actions on the Property not caused by Grantee prior to, and during the Term of, this Agreement. This indemnification shall survive the termination or expiration of this Agreement.

**14. <u>DEFAULT; REMEDIES</u>.**

a. In the event of Grantee's default under this Agreement, and as applicable, Replacement Tenant in an instance where Grantee and Replacement Tenant are jointly and severally liable, Grantor shall provide Grantee and Replacement Tenant, as applicable, with written notice specifying in reasonable detail the nature of such default, and Grantee shall promptly take such actions as are reasonably necessary to cure such default. In the event Grantee or Replacement Tenant, as applicable, does not commence such cure within sixty (60) days after receipt of such notice and diligently pursue the cure, Grantor may pursue any or all remedies available at law and in equity, including, but not limited to, monetary damages and injunctive relief with the exception of terminating this Agreement.

b. In the event of Grantor's default under this Agreement, Grantee shall provide Grantor with written notice specifying in reasonable detail the nature of such default, and Grantor shall promptly take such actions as are reasonably necessary to cure such default. In the event Grantor does not commence such cure within sixty (60) days after receipt of such notice and diligently complete the cure, Grantee may pursue any or all remedies available at law and in equity, including, but not limited to, monetary damages and injunctive relief.

c. With respect to Additional Fees, subject to the terms of this Agreement, Grantor shall be entitled to enforce those rights and remedies of lessor under the Existing Agreement with respect to the Additional Fees. In the event of a default by Tenant with respect to the Additional Fees, Grantor shall deliver to Grantee a written notice of a default by Tenant (a "**<u>Tenant Default Notice</u>**"). Grantee may elect, in its sole and absolute discretion, but shall not be obligated, to enforce the rights and remedies of lessor under the Existing Agreement against Tenant, as the case may be, with respect to such default(s). If Lessee delivers written notice to Lessor within ten (10) calendar days after receipt of the Tenant Default Notice, then

Grantee shall have the exclusive right to enforce the rights and remedies of lessor under the Existing Agreement with respect to the default(s) identified in the Tenant Default Notice. If Grantee does not notify Grantor of its intent to pursue enforcement of the Existing Agreement, then Grantor may enforce the rights and remedies of lessor under such agreements against Tenant with respect to the default(s), provided that Grantor shall not enforce any right or remedy against the Tenant other than for compensatory damages and/or specific performance. Notwithstanding anything herein to the contrary, Grantor shall not seek to terminate the Existing Agreement, collect any rent payments due thereunder (excluding the Additional Fees) or evict or dispossess Tenant from the Easement Area.

d. Subject to Section 62 of the Existing Agreement, in the event Grantor fails to perform its obligations and responsibilities under the Existing Agreement and Tenant is unable to exercise its self-help rights pursuant to Section 62, the Parties agree that Grantee shall have the right to take appropriate action to cure such default subject to notice and cure periods comparable to the those given to the Tenant in the Existing Agreement with respect to Grantor's defaults thereunder to include without limitation Tenant's right to exercise its right to immediately and unconditionally cure Grantor's default with no notice or cure periods as it relates to the physical condition or environment of the Switch Space or the continued operation of the and functionality of Tenant's system and the Facilities.

**15. NOTICES**. All notices required to be given under this Agreement, unless otherwise stated, shall be in writing and delivered in person or by a national overnight delivery service (and shall be effective when received, when refused or when the same cannot be delivered) to the appropriate party at the address set forth below (or at such other address designated in writing pursuant to the terms hereof):

As to Grantor: 411 Boulevard of Americas<br>Suite 207<br>Lakewood, NJ 07801<br>Attn: Norman Eisen

As to Grantee: c/o Landmark Dividend LLC<br>400 Continental Blvd, Suite 500<br>El Segundo, CA 90245<br>Attn: Legal Dept.

**16. INDEMNITY**. Grantor and Grantee shall each indemnify, defend and hold the other harmless against any and all costs (including reasonable attorney's fees), damages, and claims of liability or loss arising (a) out of the breach of any representation, warranty or covenant of such indemnifying party set forth herein, and (b) out of the use and/or occupancy of the Property and the Easement Area by the indemnifying party, but excluding in each instance any claims to the extent arising from the negligence or intentional misconduct of the indemnified party.

**17. ESTOPPEL.** Within fifteen (15) days after either Grantor's or Grantee's written request, the other party shall execute and deliver to the requesting party a statement (i) certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and whether any options granted to Grantee pursuant to the provisions of this Agreement have been exercised, (ii) certifying that there are no sums due from Grantee (or, if there are sums due, the amount(s) due), (iii) stating whether or not, to the best knowledge of the certifying party, the other party is in default in performance of any of its obligations under this Agreement, and whether the certifying party is in default to the certifying party's best knowledge, and, if so, specifying each such default of which the certifying party may have knowledge, and (iv) certifying such other facts as the requesting party reasonably requests, it being intended that any such statement delivered pursuant hereto may be relied upon by others with whom the party requesting such certificate may be dealing and their respective successors and/or assigns. The estoppel certificate from Grantee shall also identify any amendments or modifications of the Existing Agreement and any Replacement Agreement with a tenant (or an amendment thereto), whether or not Grantor's consent is required, and shall attach true, correct and complete copies of all such documents, subject to any confidentiality agreements between Grantee and any tenant. In the event of any such confidentiality agreement with a tenant, Grantee shall use reasonable efforts to obtain such consent, and shall provide to Grantor such information regarding the amendment, modification or agreement as Grantee can, consistent with the confidentiality agreement.

**18. SUBORDINATION**. This Agreement shall be subject and subordinate to any present or future mortgagee of Grantor, and within fifteen (15) business days of Grantor's request, Grantee shall, and/or cause Tenant to enter into a Subordination, Non-Disturbance and Attornment Agreement ("SNDA") with Grantor and any mortgagee of Grantor in a form reasonably acceptable to Grantee. Any such SNDA shall be recordable and assignable, and shall provide that (i) Grantee shall not be

joined in any foreclosure of the Security Instrument unless such joinder is necessary to foreclose the Security Instrument, and then only for such purpose and not for the purpose of terminating this Agreement, the Existing Agreement or any future leases, and (ii) Grantee's interest in this Easement and the Existing Agreement and any replacement leases, as well as the right to collect rent due thereunder, shall not be disturbed. Lessee shall not bear any cost or expense with respect to such subordination, or the execution and recordation of an SNDA.

19. **FORCE MAJEURE**. The time for performance by Grantor or Grantee of any term, provision, or covenant of this Agreement shall be deemed extended by time lost due to delays resulting from strikes, civil riots, floods, earthquakes, labor or supply shortages, material or labor restrictions by governmental authority, litigation, injunctions, and any other cause not within the control of Grantor or Grantee, as the case may be, and not the fault of the Party delayed in performing work or doing acts, and where reasonable measures by such Party could not have avoided or mitigated the effects of such acts.

20. **RECORDING**. This Agreement shall be recorded at Grantee's expense. Upon such recording, Grantee shall promptly provide a true, correct and complete copy thereof to Grantor. Upon termination of this Agreement Grantee shall promptly discharge the Agreement.

21. **MISCELLANEOUS**. The Existing Agreements, covenants and rights contained in this Agreement are not personal to Grantor but are appurtenant to and shall run with the land and shall be binding upon and shall inure to the benefit of all present and future owner(s) of the Property and their successors in title or interest and their permitted assigns. Grantee may pledge, assign, mortgage, grant a security interest, or otherwise encumber its interest in and to this Agreement to secured parties, successors-in-interest, acquiring entities or individuals, and any other party to whom Grantee may be required to provide collateral or demonstrate creditworthiness. In the event of any conflict between either the Existing Agreement or this Agreement this Agreement former shall control. This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio without regard to its conflict of laws provisions, and venue for any suit or claim related to this Agreement shall be the courts for Cuyahoga County, Ohio, and the Parties agree not to object to venue being laid in such forum on the grounds of forum nonconveniens or any other legal theory.

22. **CAPTIONS AND HEADINGS**. The captions and headings in this Agreement are for convenience and shall not be held or deemed to define, limit, describe, explain, modify, amplify or add to the interpretation, construction or meaning of any provisions of or the scope or intent of this Agreement.

23. **CUMULATIVE REMEDIES**. Except as otherwise expressly provided herein, each and every one of the rights, benefits and remedies provided to Grantor or Grantee by this Agreement, or by any instrument or documents executed pursuant to this Agreement, are cumulative and shall not be exclusive of any other of said rights, remedies and benefits allowed by law or equity to Grantee.

24. **COUNTERPARTS**. This Agreement may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

25. **SEVERABILITY**. If any provision of this Agreement is deemed unenforceable in whole or in part, such provision shall be limited to the extent necessary to render the same valid or shall be excised from this Agreement, as circumstances require, and this Agreement shall be construed as if such provision had been so limited or as if such provision had not been included herein, as the case may be.

26. **ENTIRE UNDERSTANDING AND AGREEMENT**. This Agreement and the Purchase and Sale Agreement entered into by and between Grantor and Grantee, and the closing documents executed in connection therewith, constitute the entire understanding between the parties with regard to the subject matter hereof and there are no representations, inducements, conditions, or other provisions other than those expressed herein. This Agreement may not be modified, amended, altered or changed in any respect except by written agreement and signed by each of the parties hereto.

27. **LIMITATION OF LIABILITY**. Neither Party shall be liable to the other, or any of their respective Tenants, lessees, sublessees, licensees, agents, representatives, successors, assigns or employees for any, incidental, punitive, indirect, special or consequential damages, even if advised of the possibility of such damages, whether under theory of contract, tort (including negligence), strict liability or otherwise. The word "Grantor" in this Agreement includes the Grantor executing this Agreement as well as its successors and assigns, each of which shall have the same rights, remedies, powers, authorities and privileges as it would have had it originally signed this Agreement as Grantor. Any such person or entity, whether or not

named in this Agreement, shall have no liability under this Agreement after it ceases to hold title to the Property, unless such liability arises directly from the Lessor's fraud or misrepresentation. Grantee shall look solely to Grantor's successor in interest for the performance of the covenants and obligations of the Grantor hereunder which subsequently accrue. In no event shall Grantor be liable to Grantee for any loss of business or profits of Grantee, or for consequential, punitive or special damages of any kind, but specifically excluding loss of rents. Neither Grantor nor any principal of Grantor nor any owner of the Property, whether disclosed or undisclosed, shall have any personal liability with respect to any of the provisions of this Agreement or the Property; Grantee shall look solely to the equity of Grantor in the Property for the satisfaction of any claim by Grantee against Grantor.

28. **WARRANTIES DISCLAIMED**. EXCEPT TO THE EXTENT STATED HEREIN AND IN THE INSTANCE OF FRAUD, LESSOR DISCLAIMS ALL WARRANTIES OR CONDITIONS, EXPRESS OR IMPLIED, AS TO THE PROPERTY AND LEASED PREMISES, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THIS DISCLAIMER CONSTITUTES AN ESSENTIAL PART OF THIS AGREEMENT. SUBJECT TO THE FOREGOING, GRANTEE ACCEPTS THE LEASED PREMISES "AS IS."

29. **WAIVER OF JURY TRIAL**. Each Party, to the extent permitted by law, knowingly, voluntarily and intentionally waives its right to a trial by jury in any action or proceeding under any theory of liability arising out of or in any way connected with this Agreement or the transactions it contemplates.

[SIGNATURES APPEAR ON FOLLOWING PAGES.]

IN WITNESS WHEREOF, the parties hereto have executed this Easement and Assignment Agreement as of the Effective Date.

**GRANTOR:**

**OAK TREE EXECUTIVE CENTER LLC,**
a New Jersey limited liability company

By: ______________________
Name: Naftaly Elson
Title: Authorized Signatory

STATE OF New Jersey )
) ss:
COUNTY OF Ocean )

On 3/12/24, 2024, before me, Mindel Teitz, Notary Public, personally appeared Naftaly Elson, who proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscrihed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature ______________________

MINDEL TEITZ
NOTARY PUBLIC - STATE OF NEW JERSEY
MY COMMISSION EXPIRES 4/29/26
COMMISSION # 50158941

IN WITNESS WHEREOF, the parties hereto have executed this Easement and Assignment Agreement as of the Effective Date.

**GRANTEE:**

**360 S LAKE DESTINY DRIVE LLC,**
a Delaware limited liability company

By: ______________________________
Name: ____________________________
Its: Authorized Signatory

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of Los Angeles

On__________________ before me, __________________________________ (here insert name and title of officer), personally appeared ______________________________________, who proved to me on the basis of satisfactory evidence to be the person(s) whose name (s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

Witness my hand and official seal.

Signature______________________________ (Seal)

**EXHIBIT A**

**PARENT PARCEL DESCRIPTION**

Situated in the City of Independence, County of Cuyahoga and State of Ohio: And known as being Parcel No. 5 in the Plat of Lot Split and Sanitary Sewer Easement for B.S.G. Properties, Inc. and Centerior Properties Company of part of Original Independence Township Lot No. 23, Tract 2, West of the Cuyahoga River, as shown by the recorded Plat in Volume 286 of Maps, Page 45 of Cuyahoga County Records, be the same more or less, and more particularly bounded and described as follows: Beginning at an iron pin at the southwesterly corner of said Original Lot No. 23; Thence North 00 deg. 04' 37" East along the westerly line of said Original Lot No. 23, being also the corporation line common to the City of Independence and the City of Seven Hills, a distance of 757.29 feet to the southwesterly corner of land conveyed to Duke Realty, Ltd. Volume 97-08794, Page 2-4 of Cuyahoga County Records at which point a 5/8" iron pin found with Cap (Ciuni & Lynn #7394); Thence North 89 deg. 47' 14" East along the southerly line of said land, a distance of 735.66 feet to the westerly line of Oak Tree Boulevard, 100 feet wide, dedicated on the plat recorded in Volume 226 of Maps, Pages 99-100 of Cuyahoga County Records, and extended; Thence South 00 deg. 12' 46" East along said westerly line of Oak Tree Boulevard, a distance of 756.46 feet to the southerly line of Original Lot No. 23, at which point 5/8" iron pin was set with cap (Ciuni & Lynn #7394); Thence South 89 deg. 43' 23" West along said southerly lot line, a distance of 739.49 feet to the Principal Place of Beginning and containing 12.8156 acres of land according to a survey made by Ciuni & Lynn Associates dated June 16, 2000. Together with the following easements appurtenant to the above-described premises: 1. Underground Easement for a sanitary sewer line right-of-way including ingress and egress for repair and maintenance, from Duke Realty Limited Partnership to Centerior Properties Company, dated August 21, 1997 and recorded in Volume 97-08794, Page 46 of Cuyahoga County Records. 2. Sign Easement by and between Duke Realty Limited Partnership and Centerior Properties Company, Inc. dated August 21, 1997, and recorded in Volume 97-08795, Page 3 of Cuyahoga County Records. NOTE FOR INFORMATION: Being Parcel No(s). 562-28-015, of the City of Independence, County of Cuyahoga.

## EXHIBIT B

## LEASED PREMISES/EASEMENT AREA

*Being an Easement over, across and through the following described premises:*

Being approximately 27,977 rentable square feet located on the 1st Floor, designated as Suite No. 190, as generally depicted on the drawings attached to the Office Lease, evidenced by Memorandum of Lease recorded on March 12, 2012 in Instrument No. 201203120448, and expansion space being approximately 16,500 rentable square feet located on the 4th Floor, as generally depicted on the drawings attached to the unrecorded Third Amendment to Office Lease, all located within the Building at 6200 Oak Tree Boulevard, Independence, Ohio.

*The aforementioned description is contained within a building constructed on the following described real property:*

Situated in the City of Independence, County of Cuyahoga and State of Ohio:

And known as being Parcel No. 5 in the Plat of Lot Split and Sanitary Sewer Easement for B.S.G. Properties, Inc. and Centerior Properties Company of part of Original Independence Township Lot No. 23, Tract 2, West of the Cuyahoga River, as shown by the recorded Plat in Volume 286 of Maps, Page 45 of Cuyahoga County Records, be the same more or less, and more particularly bounded and described as follows:

Beginning at an iron pin at the southwesterly corner of said Original Lot No. 23;

Thence North 00 deg. 04' 37" East along the westerly line of said Original Lot No. 23, being also the corporation line common to the City of Independence and the City of Seven Hills, a distance of 757.29 feet to the southwesterly corner of land conveyed to Duke Realty, Ltd. Volume 97-08794, Page 2-4 of Cuyahoga County Records at which point a 5/8" iron pin found with Cap (Ciuni & Lynn #7394);

Thence North 89 deg. 47' 14" East along the southerly line of said land, a distance of 735.66 feet to the westerly line of Oak Tree Boulevard, 100 feet wide, dedicated on the plat recorded in Volume 226 of Maps, Pages 99-100 of Cuyahoga County Records, and extended;

Thence South 00 deg. 12' 46" East along said westerly line of Oak Tree Boulevard, a distance of 756.46 feet to the southerly line of Original Lot No. 23, at which point 5/8" iron pin was set with cap (Ciuni & Lynn #7394);

Thence South 89 deg. 43' 23" West along said southerly lot line, a distance of 739.49 feet to the Principal Place of Beginning and containing 12.8156 acres of land according to a survey made by Ciuni & Lynn Associates dated June 16, 2000.

NOTE FOR INFORMATION: Being p/o Parcel No(s). 562-28-015, of the City of Independence, County of Cuyahoga.

# EXHIBIT C

## EXISTING AGREEMENT DESCRIPTION

Office Lease dated March 12, 2002, by and between 360 S Lake Destiny LLC, Landlord and T-Mobile Central LLC, as Tenant, as amended, by that certain First Amendment to Office Lease dated December 14, 2011, as further amended by that certain Second Amendment to Office Lease dated November 15, 2016, as further amended by that certain Third Amendment to Office Lease dated April 30, 2020, as further amended by that certain Fourth Amendment to Office Lease dated July 17, 2023.

# EXHIBIT G

EPSTEIN | OSTROVE
A LIMITED LIABILITY COMPANY

Elliot D. Ostrove
Partner
REPLY TO:
Edison office
e.ostrove@epsteinostrove.com
Direct: (732) 820-7761

# CEASE AND DESIST

July 16, 2026

**VIA E-MAIL, CERTIFIED MAIL, AND REGULAR MAIL**

9589 0710 5270 2041 3754 58
T-Mobile Central LLC
12920 SE 38th St.
Bellevue, WA 98006
Attn: National Lease Administration
jerry.ciolek@t-mobile.com
Luke.Lamb@T-Mobile.com;

9589 0710 5270 2041 3754 41
T-Mobile Central LLC
12920 SE 38th St.
Bellevue, WA 98006
Attn: Managing Attorney-Real Estate

**Re: 6200 Oak Tree Boulevard, Independence OH**

Dear Sir/Madam:

We represent Oak Tree Executive Center LLC (collectively, "Oak Tree"), owner of the commercial property located at 6200 Oak Tree Boulevard, Independence, OH (the "Property"). It is our understanding that T-Mobile Central LLC ("You" with Oak Tree, the "Parties") rents a portion of the Property (the "Demised Premises") pursuant to an Office Lease, dated March 12, 2002 and as amended December 14, 2011, November 15, 2016, April 30, 2020, and July 17, 2023 (the "Fourth Amendment") (collectively, the "Lease"). We further understand that You rent a generator yard on the Property pursuant to the Fourth Amendment.

Reference is made to the enclosed (1) Stop Work Notice, issued April 27, 2026 (directing You to cease all work to the exterior of the Property no later than 4:00PM on April 30, 2026 (the "Stop Work Notice")); (2) proposed Fifth Amendment to Office Lease (the "Proposed Fifth Amendment"); (3) generator yard Site Plan (the "Site Plan"); and (4) letter from Oak Tree to You, dated May 21, 2026 (the "May Letter").

Since executing the Fourth Amendment, You have improperly shifted the generator yard from the agreed upon location (*see* Site Plan) and improperly captured space within the interior of the Property. Specifically, the generator yard has shifted 30-40 feet and currently occupies the entire rear yard of the Property. It's now come to Oak Tree's attention that You intend to install the generators (*i.e. "drop the generators"*) within the next two (2) weeks. Such actions will not be countenanced.

You have also improperly captured space throughout the Property, including approximately 100 square feet of the fourth floor hallway – an action You would only be permitted to take once the Proposed Fifth Amendment has been fully executed. Your unauthorized actions within the Property also include, but are not limited to, running conduits, commandeering the duct work, and occupying entire shafts.

## CEASE AND DESIST

For the reasons set forth in the May Letter, You must immediately **CEASE AND DESIST** performing all unauthorized exterior construction work on the Property. The unauthorized exterior work includes, but is not limited to, performing any work on or to the (1) rear parking lot (including paving); (2) roof; (3) generator yard; (4) retaining wall; or (5) landscaping. The work ***may not resume*** working until such time as the Parties finalize and execute the Proposed Fifth Amendment to the Lease. Oak Tree awaits your comments to its most recent draft, as attached hereto.

Demand is also made that You **immediately CEASE AND DESIST** all unauthorized use and occupancy of the interior space within the Property, as set forth above.

However, You **must continue to**:

1. Perform work relating to the storm water pollution prevention system;
2. Perform work to achieve slope stabilization;
3. Perform work relating to soil stabilization and erosion prevention;
4. Perform work relating to dust, dirt and mud control; and
5. Ensure compliance with all safety regulations (including shoring regulations).

Oak Tree reserves all rights to enforce the Lease, and to take any action necessary to protect its interests, both at law and in equity. We expect to hear from You, or an attorney representing You, within three (3) days of Your receipt of this correspondence with confirmation that You have taken the necessary steps to comply with each of the above. If we do not hear from You, or an attorney representing You, within that time, we will do whatever is necessary to protect our clients' rights at law and in equity.

Nonetheless, we invite You to call us to discuss these issues so that we can attempt to work towards a mutually acceptable resolution.

Be guided accordingly.

Very truly yours,
EPSTEIN OSTROVE, LLC

By: ______________________
ELLIOT D. OSTROVE

Enclosures

Cc: Jalia Dennis – Landmark Dividend LLC (via e-mail)
Karlton Holston – Landmark Dividend LLC (via e-mail)
Joseph Rivera – Landmark Dividend LLC (via e-mail)
Mercedes Stevenson – Landmark Dividend LLC (via e-mail)

**CEASE AND DESIST**

JaCara R. Cox – First Energy Corp. (via e-mail)
Diane M. Kurrass – Newmark Group, Inc. (via e-mail)
Jerry Ciolek – T-Mobile (via e-mail)
Keely Weidenbach – T-Mobile (via e-mail)
Luke Lamb – T-Mobile (via e-mail)
Dom Sciria – Project Guidance, LLC (via e-mail)
Thomas McKenzie – EXP (via e-mail)

D **Dom Sciria** <ourprojectguides@gmail.com> Mon, Apr 27, 11:38 AM

to Luke, Thomas, Earl, Joseph, Mercedes, Diane, Norman, Mark, Martin, Molly@avalairgroup.com

Gentlemen,

On behalf of, and at the direction of Building Ownership:

Please consider this as notice that all work at the exterior of the 6200 Oak Tree Boulevard property is to cease at 4:00 PM EDT this Thursday, April 30, 2026.

Also by 4:00 PM EDT this Thursday, April 30, 2026 any construction materials, supplies, equipment, tools, trailers and vehicles that have been placed in areas that could inhibit Building Ownership's access to the facades of the building must be moved to locations elsewhere within the construction zone. Work at the interior of the building can continue. The office trailer can remain in its current location for the time being.

Please also note that after 4:00 PM EDT this Thursday, April 30, 2026 all work at the exterior of the 6200 Oak Tree Boulevard property is to remain on hold until further notice by Building Ownership.

Respectfully,

Dom

**Dom Sciria, Principal**
**Project Guidance, LLC**
**9865 Highland Drive**
**Brecksville, Ohio 44141**
**440-527-4745**

Reply Forward





**OAK TREE EXECUTIVE CENTER LLC**
**411 Blvd of the Americas**
**Suite 207**
**Lakewood, NJ 08701**

May 21, 2026

**VIA FEDERAL EXPRESS**
T-Mobile Central LLC
12920 SE 38th St.
Bellevue, WA 98006
Attn: National Lease Administration

**Re:** **Office Lease dated March 12, 2002, as amended by First Amendment to Office Lease dated December 14, 2011, as amended by Second Amendment to Office Lease dated November 15, 2016, as amended by Third Amendment to Office Lease dated April 30, 2020 (the "Third Amendment") and as further amended by Fourth Amendment to Office Lease dated July 17, 2023 (as amended, the "Lease"); Oak Tree Executive Center LLC, a New Jersey limited liability company ("Land Owner"); T-Mobile Central LLC, a Delaware limited liability company ("Tenant"); 6200 Oak Tree Boulevard, Independence, Ohio (the "Property")**

Dear Tenant:

We are in receipt of both (i) your February 10, 2026 letter (the "**Tenant's February Letter**") addressing Tenant's responses to Land Owner's claims and demands relating to the Lease, as set forth in Land Owner's January 20, 2026 letter to Tenant (the "**Land Owner's Letter**"), and (ii) your May 13, 2026 letter (the "**Tenant's May Letter**") pursuant to which Tenant rejects Land Owner's demand for Tenant to cease all exterior construction activities at the Property in violation of the Lease.

While Land Owner appreciates Tenant's agreement and willingness to resolve certain matters identified in the Land Owner's Letter, Tenant continues to be in breach of its obligations under the Lease with respect to other matters. As a result of such breach, Land Owner hereby demands that Tenant immediately cease all exterior construction work at the Property in violation of the Lease (except to the extent such work complies with the terms of the Lease and relates to the stormwater pollution prevention system slope stabilization, soil erosion, dust, dirt and mud control and compliance with safety regulations, (including shoring) at the Property, as more fully set forth herein).

Land Owner also disputes Tenant's claims and assertions in the Tenant's May Letter, as more fully set forth herein.

All capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Lease.

**<u>Parking Violations / Repaving of Rear Parking Lot at the Property</u>**:

With respect to the asphalt paving work to be performed at the Property, Tenant states in the Tenant's February Letter that "Tenant will perform that work themselves as called for in the project schedule". In Tenant's original project schedule dated on or around March 16, 2023, Tenant represented that it would complete the paving work at the rear of the Property by the end of calendar year 2024. In April of 2024, Tenant submitted a revised project schedule to Land Owner contemplating the completion of such paving work in August of 2025.

As you know, the paving work has still not been completed, well over a year after the original scheduled completion date. Tenant's prolonged delay in completing such paving work has caused Land Owner to incur damages and has materially and adversely affected Land Owner's operations at the Property, including, without limitation: (i) other tenant's inability to use parking spaces affected by Tenant's ongoing construction activities at the Property, (ii) continued wear and tear on the parking areas of the Property affected by Tenant's construction activities and (iii) the overall negative appearance of the Property resulting from Tenant's continued constriction activities at the Property.

Land Owner is no longer confident in Tenant's ability to complete the asphalt paving work in a timely or responsible manner. As of this writing, Tenant's construction team still has not provided a schedule for the completion of site work and asphalt paving. Accordingly, Land Owner requires that such paving work be removed from Tenant's construction team's contract. Land Owner will agree to perform such paving work on Tenant's behalf, with Tenant to be responsible for reimbursing Land Owner for any and all costs incurred by Land Owner to complete such paving work at the rear of the Property.

Please note that the arrival of new tenants is increasing occupancy in the Building and, in turn, making it even more urgent to restore the parking spaces currently occupied by Tenant's construction team.

**<u>Roof Leaks and Delay of Annex Roof Work</u>**:

Land Owner disagrees with Tenant's statement in the Tenant's February Letter that Tenant's construction team understood that the "roof work at the annex could be performed ahead of Tenant's activities" on the roof of the Building. Beginning with the January 30, 2024 planning meeting, Land Owner repeatedly advised Tenant and Tenant's construction team that Tenant was required to complete the installation of the condensers and screen walls before Land Owner could install the new Annex roof. As repeatedly communicated to Tenant, it would not constitute sound construction practice to install a new single-ply roof on the Annex and then permit multiple contractors to cut two dozen or more penetrations into the new roof and rig equipment weighing thousands of pounds onto it. This matter was addressed, and Land Owner's position was clearly identified, during every weekly conference call and in each weekly report published by Tenant's construction team.

Tenant's delay in installing the condensers and screen walls on the roof of the Building, which in turn delayed Land Owner's installation of the new Annex roof, has caused Land Owner

to incur substantial damages and out-of-pocket costs, including, without limitation, roof repair and maintenance expenses, costs to remediate water damage resulting from roof leaks at the Building, restoration costs associated with such leaks, and loss of rent and other revenue arising from other tenants' claims of interruption to their use of their respective leased premises.

Tenant was fully aware that it was required to complete the installation of the condenser and screen walls on the roof of the Building before Land Owner could proceed with installation of the new Annex roof. Accordingly, Tenant is responsible for reimbursing Land Owner for any and all damages incurred as a result of Tenant's failure to complete such work in a timely manner.

**Obstruction of Asphalt Resurfacing**:

Contrary to Tenant's claim in the Tenant's February Letter, Tenant's delays in (i) completing the paving of the rear parking lot, (ii) changing the project scope to include excavation of a portion of the front parking area and (iii) failing to execute the contemplated Fifth Amendment to Office Lease have, in fact, caused Land Owner to incur damages and other expenses arising from the inability to repave the front parking area at the Property.

Land Owner has repeatedly notified Tenant during weekly conference calls that Land Owner's plans to repave the front parking area of the Property was contingent on (i) Tenant's completion of its construction work at the rear of the Property, and (ii) Tenant's execution of the contemplated Fifth Amendment to Office Lease to address Tenant's requested excavation work in the front parking area of the Property, both of which conditions remain unsatisfied.

As a result of these delays, Land Owner's costs to repave the asphalt parking area have increased significantly from that originally contemplated when the work was scheduled to be performed in the summer of 2025. Please also note that the arrival of new tenants and the increased occupancy of the Building will make the logistics of the asphalt resurfacing project more difficult and further increase costs. As a result, this work may now need to be performed after hours or on Saturdays, as there will no longer be a sufficient number of available parking spaces that can be blocked off to allow resurfacing work to be completed in sections during regular business hours.

**Degradation of Building Appearance**:

Notwithstanding Tenant's statements in the Tenant's February Letter that it has "cleaned up the landscaping surrounding Tenant's construction area", significant appearance and other visible issues at the Property continue to exist as a result of Tenant's construction activities at the Property, including, without limitation, (i) ongoing deterioration of the excavated slope, (ii) the ongoing storage of construction materials, , (iii) the presence of sediment ponds and (iii) muddy pavement within the Tenant's constriction zone. Simply put, Tenant's construction activities have, and continue to be, a visual nuisance to other tenants and occupants of the Building. In recent weeks, other tenants have increased their complaints regarding (i) the appearance of the south elevation of the Building, (ii) dirty windows and (iii) the views of the construction site from their office windows.

Furthermore, dirty storm water and mud from within Tenant's construction zone periodically extend beyond the fenced-in construction area into the adjacent parking lot. This has once again become an issue with the resumption of construction work in the generator yard area.

As previously discussed with Tenant's management team, dust and dirt generated from the Tenant's construction zone have settled on the entire south façade and a portion of the west facade of the Building, further detracting from the Building's appearance. Land Owner will agree to clean the windows once access to the south elevation of the Building is available; however, Tenant should first power wash the Building façade.

**Degradation of Retaining Wall**:

Land Owner appreciates Tenant's agreement to complete the repair of the retaining wall as set forth in the Tenant's February Letter. However, Land Owner requires that such work be completed by June 30, 2026, subject to any force majeure delays. If Tenant fails to complete such work within the time period set forth above, Land Owner reserves the right to exercise any and all rights and remedies available under the Lease, and/or at law or in equity.

**Destruction of Stairwell**:

With respect to the staircase that has been previously removed by Tenant, please provide any documentation confirming that Tenant had no obligation to restore or replace the same. Unless Tenant is able to provide any such documentation to Land Owner, Land Owner will require Tenant to promptly perform such replacement and restoration of such stairwell in a manner acceptable to Land Owner, the plans and specifications of which shall be set forth in the Fifth Amendment to Office Lease.

**Revisions to Landscape Plans**:

With regard to the landscape plans, as amended through Construction Bulletin 16 and which shall continue to be contingent on Land Owner's further review of the proposed plans, Land Owner will require, as a condition of the Fifth Amendment to Office Lease that Tenant shall install an irrigation system as part of the project scope and thereafter bear the ongoing costs to (i) maintain grasses and/or lawns planted as part of the landscape design, (ii) mulch, water, fertilize, prune and maintain the landscaping plantings, (iii) obtain and provide copies of a written 1 year warranty for all plantings, (iv) indemnify and hold harmless the Land Owner, in the event that a tree falls into the generator yard, elsewhere on the property or onto a neighboring property (please note that species specified on the landscape plans can grown to 65 ft tall with branch spreads of 30 feet) and (v) replace plantings damaged by weather, disease or insects

Please also note that Land Owner has advised Tenant's construction team that Land Owner does not approve of the plan revisions which changed the generator yard fencing to a Basteel Citadel security fence with a spear tipped R-Top. As a condition of the Fifth Amendment to Office Lease, an alternate fence will need to be provided, contingent on Land Owner's approval.

**Revised First Energy Easements**:

Land Owner will require that the proposed revisions to the above and below ground easements for First Energy, subject to Land Owner's approval, be included in the Fifth Amendment to Office Lease, and referenced by exhibits to the Fifth Amendment to Office Lease.

**Unauthorized Use of Front Entrance**:

Contrary to the statement identified in the Tenant's February Letter, Tenant continues to use the front entrance for moving, shipping and delivery of furniture, merchandise, trade fixtures and equipment. As mentioned in the Land Owner's Letter, Section 10 of the Third Amendment states that the moving, shipping or delivery of furniture, merchandise, trade fixtures and equipment by Tenant is to be done at such times and in such manner as may be reasonably required by Land Owner. The front entrance, main lobby and first floor common area corridors are not to be used for these purposes.

Tenant continues to violate the provision of the Lease as set forth above, and Land Owner reserves the right, and intends to fine Tenant for each such further violation as may be set forth in the Lease.

**Misuse of Conduit Shafts**:

With respect to the updated plans relating to Tenant's condenser units and use of shafts at the Building, Land Owner repeatedly made clear to Tenant that Land Owner's approval of any changes or modifications to the plans as set forth in the Third Amendment, as may have been modified or updated during Land Owner's review process, would be expressly conditioned upon Tenant's execution of the Fifth Amendment to Office Lease, which would formally memorialize Land Owner's approval of such changes. Since Tenant has not executed the Fifth Amendment to Office Lease, Land Owner maintains that Tenant has installed its condenser units and utilized the shafts in violation of the Lease.

With respect to Tenant's statement that Tenant's new piping "does not occupy the entire building shaft", Tenant's construction team has already confirmed to Land Owner that the remaining portions of the shafts do not have enough space to accommodate any additional conduit or piping. Accordingly, Tenant has effectively encumbered the entire shaft, rendering it unusable by Land Owner or any other tenants or occupants of the Building. It is Land Owner's position that Tenant should pay rent for the use of such shaft, as Tenant is receiving the sole and exclusive benefit therefor for its condenser units. Please also note that Tenant's most recent plans and specifications received by Land Owner (through Construction Bulletin 18 as of this writing) still indicate the original layout for routing conduit and piping to the Annex Roof, and not the actual installation.

**Stormwater System**:

Land Owner appreciates Tenant's delivery of the storm water discharge permit issued by the Ohio EPA. Please be advised, however, that the Ohio EPA regulations require that the storm

water discharge permit be in place twenty-one (21) days before the start of work. Please provide copies of the notice of intent (NOI) and application documents submitted to the Ohio EPA. Please also note that the referenced NPDES permit is dated October 17, 2025, which is more than a year after excavation work began.

Please also note that the November 11, 2025 Cuyahoga Soil and Water Conservation District Field Survey Report, attached as part of Exhibit C to the Tenant's February Letter, directs the contractor to stabilize the slope over the winter (weather conditions permitting) and to provide a written response indicating the actions that the contractor will take to address the deficiencies and stabilize the slope. The records of Tenant's construction teams will show that there were opportunities to comply with the Conservation District's instructions to stabilize the excavated slope. In fact, crews were laying out generator yard foundations intermittently for more than a month before a winter storm stopped work in the generator yard in January. Please also note that Tenant's project plans require that, if it is not possible to stabilize a slope using vegetation due to weather or other conditions, then the contractor must employ alternative soil stabilization techniques, including mulching and erosion matting.

The Tenant's February Letter also fails to mention the January 29, 2026 Conservation District field report. That report indicates that the slope was temporarily stabilized by freezing conditions, but it also again calls for slope stabilization and again refers to "deficiencies" that must still be addressed. The report further instructs the contractor to provide a response indicating the actions that the contractor will take to address those deficiencies.

It is Land Owner's understanding that the actions spelled out in both the November and January Cuyahoga Soil and Water Conservation District Field Survey Reports could and should have been taken long before winter, even without written instruction from the Soil and Water Conservation District. That is because Tenant's own project plans and specifications require that all disturbed areas which will be dormant for more than fourteen (14) days be stabilized within seven (7) days of the disturbance, and that areas that will remain dormant over winter be stabilized by November 1st. However, this was not done. As Tenant is aware, the generator yard area and adjacent slope were first excavated in the summer of 2024, and slope stabilization should have been completed that autumn. The lack of timely and adequate slope stabilization, soil erosion and storm water pollution prevention controls have directly contributed to the dust, dirt and mud problems at the Property, as referenced in the paragraph above related to the degradation of the Building's appearance.

Despite the bench work completed last summer and autumn by Tenant's construction team, the sloped portion of the generator yard area did begin to fail again earlier this year. Tenant's construction team has since installed temporary shoring, and Land Owner welcomes such initiative, as ensuring jobsite safety is Land Owner's foremost priority. However, the installation of temporary shoring does not on its own address soil erosion and slope stabilization. As of this date Tenant's construction team has still not employed the additional soil stabilization and erosion control techniques required per code and Tenant's own plans and specifications.

Land Owner has also been made aware that Tenant intends to leave the shoring materials in place permanently after completion of the project. Please note that this is another change to

the project scope of work, and Land Owner is reserving approval of said change, pending receipt of drawings from Tenant for review by Land Owner's engineers. If Tenant wishes to leave the shoring in place permanently, Land Owner's approval, if provided, will be conditioned upon an amendment to the Lease.

Failure to comply with the applicable regulations, project plans and specifications related to storm water management, including slope stabilization, and excavation site safety, places both the Land Owner and Tenant at risk. Accordingly, Land Owner requires that Tenant's construction team: (i) provide a copy of the notice of intent (NOI) and application to the Ohio EPA for the referenced storm water discharge permit, including the date of the NOI, (ii) provide copies of the written responses to the Soil and Water Conservation District reports, (iii) take immediate steps to stabilize the construction site and prevent soil erosion in accordance with the Soil and Water Conservation District's instructions and Tenant's project plans and specifications and (iv) immediately employ any additional methods necessary to protect trades working in the generator yard area in compliance with OSHA regulations.

If these actions are not taken immediately, Land Owner will direct that all work on the generator yard portion of the job site be stopped until corrective action is taken.

**<u>Unauthorized Conduit Installation in the Generator Yard</u>**:

Tenant states in the Tenant's February Letter that the conduit installation at the generator yard and the duct banks leading to the generator yard were presented to the building management team and approved. However, Tenant fails, and has continued to fail, to acknowledge that Land Owner's approval of such plans was subject to, and conditioned upon, the execution of the Fifth Amendment to Office Lease in form acceptable to Land Owner. Accordingly, Tenant continues to be in breach of the terms of the Lease.

**<u>Unauthorized Use of Fourth Floor Space</u>**:

Tenant states in the Tenant's February Letter that Tenant's construction team installed the refrigerant piping in accordance with plans which were approved by building management and Dom Sciria. However, Tenant fails, and has continued to fail, to acknowledge that Land Owner's approval of such plans was subject to, and conditioned upon, the execution of the Fifth Amendment to Office Lease in form acceptable to Land Owner. Accordingly, Tenant continues to be in breach of the terms of the Lease.

**<u>Rooftop Condenser Units</u>**:

Pursuant to the Land Owner's Letter, the Lease does not reference the plans and installations that were actually completed by Tenant's construction team. Accordingly, the Lease needs to be amended accordingly (by way of the execution of the Fifth Amendment to Office Lease).

**<u>Fifth Amendment to Office Lease</u>**:

Land Owner hereby demands that Tenant **cease** all exterior construction work at the Property that has been disputed by Land Owner, except for work related to the storm water pollution prevention system, slope stabilization, soil erosion, dust, dirt and mud control and compliance with safety regulations, (including shoring) at the Property, as set forth herein, until such time as the Fifth Amendment to Office Lease has been executed by both parties. As mentioned in the Land Owner's Letter, based upon previous communications (both in person and during telephone meetings) between Land Owner's representatives and Tenant's representatives, it was the parties intention to finalize the terms of the Fifth Amendment to Office Lease to address, among other things, the economics of the Lease, the description of the "Premises" under the Lease and the scope of Tenant's work and the project plans as set forth above.

The Fifth Amendment to Office Lease should also include (i) an updated project schedule (Land Owner has just learned that Tenant's construction team is now forecasting that it will take the rest of the year to complete the project) identifying the outside completion date of August 31, 2026 for the final completion of Tenant's construction work (not including the asphalt paving work that is to be deleted from Tenant's construction team's contract), and (ii) remedies available to Land Owner due to Tenant's failure to complete its work by any such outside completion date.

In addition, Land Owner strongly disagrees with Tenant's statement in the Tenant's May Letter that the Tenant has not received any substantive response regarding the status of the draft Fifth Amendment to Office Lease. For at least the past six (6) months, Tenant has communicated directly with representatives from 360 S Lake Destiny Drive LLC and/or Landmark Dividend LLC regarding (i) the status of the Fifth Amendment to Office Lease, (ii) the terms of such document that would or would not be acceptable to Land Owner and (iii) Land Owner's objections to Tenant's revised draft of the Fifth Amendment to Office Lease. Tenant has, in fact, received substantive comments regarding the status of the Fifth Amendment to Office Lease, contrary to the position set forth in the Tenant's May Letter.

Furthermore, Land Owner also disagrees with Tenant's statement in the Tenant's May Letter that all construction activities undertaken by Tenant have been performed in accordance with the scope previously approved under the Lease. That statement is factually incorrect. Although the Lease permits Tenant to perform certain exterior work at the Property, including construction of the generator yard, the Lease expressly limits both the scope of such exterior work and the locations where such improvements and construction may occur. Tenant has performed, and continues to perform, exterior work in violation of the existing terms of the Lease. Accordingly, Land Owner hereby demands that Tenant immediately cease all exterior construction work at the Property (except as may be otherwise set forth above).

Land Owner again requests that Tenant review the initial proposed draft of the Fifth Amendment to Office Lease and provide Land Owner with an updated set of reasonable comments that are fully consistent with the prior communications referenced above, including, without limitation, Tenant's agreement to pay for its share of operating expenses at the Property.

If Tenant fails to comply with the terms set forth herein, Land Owner reserves the right to exercise any and all rights and remedies available to Land Owner under the Lease at law and/or

in equity. Land Owner expects Tenant's immediate and complete attention to each of the issues outlined above.

Sincerely,

OAK TREE EXECUTIVE CENTER LLC

By: [signature]
Name: Norman Rosen
Title: Authorized Signatory

cc: T-Mobile Central LLC
12920 SE 38th Street
Bellevue, WA 98006
Attn: Managing Attorney-Real Estate
**Via Federal Express**

360 S Lake Destiny Drive LLC
c/o Landmark Dividend LLC
400 Continental Blvd., Suite 500
El Segundo, CA 90245
Attn: Legal Dept.
**Via Federal Express**

Weidenbach, Keely - Keely.Weidenbach2@t-mobile.com
Ciolek, Jerry - Jerry.Ciolek@t-mobile.com
Lamb, Luke - Luke.Lamb@t-mobile.com

# EXHIBIT H

July 28, 2026

**VIA UPS**:
Epstein Ostrove, LLC
200 Metroplex Drive, Suite 304
Edison, NJ 08817
Attn: Elliot D. Ostrove

**Re: 6200 Oak Tree Boulevard, Independence, Ohio — Response to Oak Tree Correspondence**

Dear Mr. Ostrove:

I write in response to the January 20, 2026 letter from Oak Tree Executive Center LLC ("Oak Tree") and the May 21, 2026 letter and Cease and Desist from your firm on Oak Tree's behalf, each of which alleges numerous defaults under the Lease and demands that T-Mobile cease certain exterior construction activities pending execution of a proposed Fifth Amendment.

Oak Tree's allegations are not supported by the Lease and are inconsistent with the contemporaneous project record, including directions given by Oak Tree's own predecessor's project representative. I address the principal issues below and outline the background to provide clarification into T-Mobile's position.

I. The Executed Lease Already Grants the Rights Necessary to Construct the Project

The Third Amendment to the Lease, executed April 30, 2020, expressly grants T-Mobile the right to use the Exterior Generator Field/Heat Rejection Equipment Space, the Heat Rejection Equipment Yard Space, and the Roof Condenser Space for installation and maintenance of generators, power equipment, and condenser units, together with associated interior and exterior conduit chaseways. The Third Amendment further provides, in terms that could not be clearer, that the accompanying exhibits:

> "are intended merely to depict the location of the applicable areas and the equipment and improvements to be placed therein, and shall not in any way limit the provisions of this Third Amendment regarding the Landlord Review."

The Fourth Amendment reflects the Landlord Review contemplated by the Third Amendment. Section 2 of the Fourth Amendment states: "Landlord hereby approves the plans attached hereto as Exhibit A." Those approved plans included the generator yard site plan (Exhibit A-1) and the utility routing plan (Exhibit A-2). The Fourth Amendment is a fully executed document bearing both parties' signatures. It is the Landlord Review.

Oak Tree's present correspondence proceeds from a contractual premise that the executed Lease never states. Specifically, Oak Tree assumes that engineering refinements made during implementation of previously approved work required execution of a subsequent lease amendment before construction could continue. Neither the Third Amendment, the Fourth Amendment, nor any other executed Lease

provision imposes such a requirement. Instead, it proceeds as though the Lease authorizes Oak Tree to halt construction categorically and piecemeal whenever engineering refinements have not yet been memorialized through an executed amendment. The Lease contains no such authority, and Oak Tree has identified none.

II. Engineering Refinements

Oak Tree's position assumes that every engineering refinement required a new contractual approval before implementation. Again, the Lease contains no such requirement. As any major construction project progresses, engineering details evolve in response to design development, municipal review, utility coordination, and — as here — directions from the previous owner's own representatives. The "Landlord Review" requirement in the Third Amendment contemplates approval of plans before commencement of work. It does not convert every subsequent engineering refinement into an independent condition precedent requiring a new signed lease amendment before work may continue.

The engineering refinements at issue here — including the generator yard location, conduit routing, and rooftop condenser configuration — arose during ordinary design development and in direct response to external requirements and owner-directed modifications. Specifically:

**Generator yard relocation.** The generator yard location was modified during municipal permitting and design development. The City of Independence's review and approval process required adjustments to the originally contemplated footprint. These modifications were made within the scope of rights granted by the Third and Fourth Amendments and were tracked through the ongoing construction management process in which Oak Tree's predecessor's representative participated throughout.

**Rooftop condenser relocation.** The rooftop condenser configuration was not changed unilaterally by T-Mobile. The relocation was specifically requested by prior ownership and Newmark, the property manager, through its project representative, Dom Sciria of Project Guidance LLC, who served as the owner's project representative during the construction process. T-Mobile complied with that direction. Oak Tree's characterization of the condenser relocation as unauthorized conduct by T-Mobile is factually incorrect and ignores its own predecessor's role in directing that change.

**Conduit routing and shaft use.** The conduit routing and shaft configurations reflected updated engineering necessary to implement the rights granted by the Third and Fourth Amendments. These changes were reviewed by the building management team and Dom Sciria in his capacity as the owner's representative, and were addressed in the draft Fifth Amendment as exhibit updates — not as new grants of rights.

None of these refinements created rights beyond those already granted by the Lease. All of them were expected to be documented through updated lease exhibits — which is precisely what the draft Fifth Amendment was intended to accomplish.

III. The Owner's Own Representative Authorized Work To Proceed

On May 15, 2024, T-Mobile circulated a draft Fifth Amendment updating the project exhibits approved through the Fourth Amendment. The following morning, May 16, 2024, Dom Sciria of Project Guidance LLC — acting in his capacity as the owner's project representative — responded that he had forwarded the draft to Building Ownership and Newmark, and confirmed:

> "Building Ownership is comfortable with the work proceeding while the lease is being amended."

That statement was not secondhand, equivocal, or the act of a neutral third party. Dom Sciria was the owner's project representative. He communicated the owner's express position. Newmark, the property manager, was copied on that communication. The draft Fifth Amendment that accompanied T-Mobile's May 15 email — and which Sciria forwarded to ownership — updated the project exhibits to reflect the final engineering configuration. It did not propose new rights or seek authorization for work that was not already sanctioned.

Even assuming, solely for purposes of discussion, that additional owner approval were required before implementation of the engineering refinements, the contemporaneous record demonstrates that such approval was communicated. More fundamentally, however, Oak Tree's current position depends upon a contractual proposition that the executed Lease never states: namely, that previously granted rights became suspended pending execution of the proposed Fifth Amendment.

IV. Oak Tree's Own Letters Undermine Its Theory

Oak Tree's May 21, 2026 letter and your firm's July 16, 2026 Cease and Desist expressly permit T-Mobile to continue performing stormwater pollution prevention work, slope stabilization, soil stabilization and erosion prevention, dust and mud control, and shoring compliance work — all of which are components of the same construction project. Oak Tree's correspondence necessarily acknowledges that T-Mobile remains authorized to perform portions of the project notwithstanding the absence of an executed Fifth Amendment. Yet Oak Tree identifies no Lease provision explaining why erosion-control work may proceed while generator installation, utility work, or other improvements authorized under the Third and Fourth Amendments may not. The Lease does not distinguish among those categories of work, nor does it authorize Oak Tree to create that distinction after the fact.

If execution of the Fifth Amendment were truly a condition precedent to further construction, no portion of the project would remain authorized — yet Oak Tree itself acknowledges that it does. Oak Tree cannot invoke the Fifth Amendment as a barrier to generator installation and utility work while simultaneously conceding that other project work proceeds under the existing Lease.

V. The Proposed Fifth Amendment History Confirms T-Mobile's Position

The draft Fifth Amendment originated as a routine exhibit update to document the final engineering configuration that had evolved during design development. T-Mobile circulated that draft in May 2024. Its representative expressly confirmed that work could continue upon review.

After the ownership transition, the proposed Fifth Amendment expanded materially. New ownership introduced revisions to base rent, operating expense obligations, and other commercial terms unrelated to the project exhibits. Oak Tree's present position improperly conflates those separate issues.

If Oak Tree maintains that specific items of work are unauthorized under the Lease, we request that Oak Tree identify, in writing: (1) each specific item of work alleged to be outside the Lease; (2) the specific Lease provision Oak Tree contends was violated; (3) the factual basis for that contention, including any explanation of how prior ownership's authorizations factor into Oak Tree's analysis; and (4) all documents and communications upon which Oak Tree relies. Until Oak Tree clarifies its position on each of those issues separately, T-Mobile cannot meaningfully respond to the broader default allegations.

T-Mobile remains prepared to execute an amendment updating the project exhibits to reflect the final engineering configuration of improvements authorized under the existing Lease. Nothing in this letter waives, limits, or prejudices any right or remedy available to T-Mobile, all of which are expressly reserved.

Very truly yours,

Daniel Moken

Daniel Moken
Principal Corp. Counsel, Legal Affairs